Susan BALDWIN, M.D.

v.

The UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON, Garland D. Anderson, M.D., John C. Jennings, M.D., Alvin L. Leblanc, M.D., Cathy Van Hook, M.D., Turner Sharp, M.D., Berel Held, M.D., each Individual sued Individually and in their Respective Official Capacity as Faculty Members of the University of Texas Medical Branch.

Civil Action No. G–95–362.

United States District Court,
S.D. Texas,
Galveston Division.

Nov. 6, 1996.

Anthony P. Griffin, Galveston, TX, for plaintiff.

Christopher N. Johnsen, Office of Attorney General, Austin, TX, Susan Sturdivant Jones, Office of Attorney General, Austin, TX, for University of Texas Branch at Galveston.

Susan Sturdivant Jones, Office of Attorney General, Austin, TX, for Garland D. Anderson, John C. Jennings, Alvin L. LeBlanc, M.D., Cathy Van Hook, M.D., Berel Held, M.D., Turner Sharp, M.D.

### ORDER GRANTING SUMMARY JUDGMENT

KENT, District Judge.

In this action, Plaintiff Dr. Susan Baldwin has alleged claims of intentional racial discrimination pursuant to 42 U.S.C. §§ 1981, 1983, and Title VI, conspiracy to discriminate pursuant to 42 U.S.C. § 1985, and state law defamation against Defendant UTMB and against the Defendant Drs. Anderson, Jennings, LeBlanc, Van Hook, Sharp and Held, in their individual and official capacities. Now before the Court is the Defendants' Motion for Summary Judgment dated April 17, 1996. For the reasons set forth below, the Motion is hereby **GRANTED.**

## I. FACTUAL BACKGROUND

Susan Baldwin was a third year medical resident at UTMB during the 1994–95 academic year. Dr. Baldwin attended medical school at UTMB, then spent the first two years of her residency at Baylor College of Medicine in Houston before transferring to UTMB for her third year. Dr. Baldwin wrote to Dr. Jennings, director of the residency program in the Department of Obstetrics and Gynecology, requesting an interview for a third year residency position at UTMB. She specifically expressed an interest in the "extensive opportunities for gynecological experience that exist within your program." During the interview with Jennings, Dr. Baldwin again expressed that one of her primary interests in the program at UTMB was the volume of cases available in which she could enhance her surgical skills. Dr. Baldwin signed the UTMB House Staff Agreement on June 24, 1994, accepting a position as a PGY3 (Post–Graduate Year 3) in the obstetrics and gynecology residency program for a one year period, July 6, 1994 to June 3, 1995.

After each rotation of residents, all faculty members are offered an opportunity to evaluate the residents and are provided an evaluation form. Faculty members are only required to fill out an evaluation if they have personally observed the resident. Pursuant to this procedure, Dr. Baldwin's professors evaluated her performance throughout her tenure at UTMB. Several of those professors have also been named as defendants in this lawsuit; therefore, those evaluations are particularly relevant and deserve close attention by the Court. Dr. Cathy Van Hook, an assistant professor at UTMB, for example, first evaluated Baldwin on August 28, 1994. In that evaluation, Van Hook stated that

Baldwin's overall knowledge base was weak and that as a PGY3 in obstetrics, she had a poor grasp of labor and delivery patients. Dr. Van Hook felt that Baldwin needed close supervision and that unless she markedly improved, she would not be able to advance to the PGY4 level. In Dr. Van Hook's second evaluation of Dr. Baldwin's performance, dated February 1, 1995, Van Hook rated Baldwin's surgical skills, teaching, acceptance of criticism and overall performance as unsatisfactory. Van Hook's evaluation states that she did not feel that Baldwin functioned at a third year level and at times Baldwin's performance was what Van Hook considered marginal for a second year resident. Specifically, Van Hook wrote:

Surgically, Susan does not seem to have a good grasp of pelvic anatomy and did not demonstrate an ability to picture the pelvis three-dimensionally—essential for pelvic surgery. When trying to teach/coach/explain to her, she seems to ignore the comments or is incapable of applying the knowledge offered. She declined the opportunity to do a TAH on a large fibroid uterus to go to clinic instead! Lack of confidence? If so avoidance only makes it worse. My biggest concern with Susan is: 1) I do *not* at any level feel she could function completely as a 4th year; Marginally as a 3rd and preferably a 2nd at best. I doubt that she is *capable* of functioning as a 3rd year *ever* secondary to personality and an innate inability to be taught. 2) Is she in the wrong field? Are we doing the right thing by allowing Susan to continue on a career choice she seems unsuitable for?

Defendant's Exhibit 2–B (emphasis in original).

Dr. Turner Sharp, an associate professor at UTMB and a defendant in this case, also had the opportunity to evaluate Dr. Baldwin's performance at UTMB. His first evaluation is dated August 25, 1994. In the evaluation, Sharp rated Baldwin's surgical skills as marginal and her overall performance as average. Sharp's second evaluation of Baldwin, dated January 24, 1995, rates Baldwin's surgical skills as unsatisfactory and her acceptance of criticism unsatis-

factory. Sharp further explains his evaluation in a memorandum to Jennings, dated January 23, 1995:

... I must give Dr. Baldwin a much less than satisfactory evaluation based on several points: 1) When she began her PGY III year here, her surgical skills were equivalent to a senior medical student, and therefore, totally unsatisfactory. In her most recent rotation, her surgical skills have improved, but certainly nowhere near the level we are expecting. I would now rate her at the level of a first year resident.... The things that really worry me about this young lady are: 1) her lack of surgical judgment, 2) the tendency to be oblivious to what is going on around her and 3) occasional shading of the truth....

Defendants' Exhibit 3–C. In Dr. Sharp's final evaluation of Baldwin in June of 1995, he continued to rank her surgical skills as somewhere between unsatisfactory and marginal, her acceptance of criticism as unsatisfactory, and her overall performance between unsatisfactory and marginal.

Defendant Dr. Berel Held, Professor and Chief of the Division of Gynecology at UTMB, also evaluated Baldwin's performance during the third year of her residency. His first evaluation on September 8, 1994, rates Baldwin's surgical skills as marginal. Dr. Held's second evaluation, on January 25, 1995, states that Baldwin was not performing at the PGY3 level judgmentally or technically.

Although she was a nice woman and kind to the patients, her progress over the last six months with respect to acquisition of knowledge and skill had not been at a pace to permit her to function satisfactorily at a PGY4 level in July of 1995.

Defendants' Ex. 4. In his final evaluation of Dr. Baldwin's performance in June of 1995, Dr. Held noted that Dr. Baldwin's general level of knowledge, which was satisfactory, did not translate to satisfactory clinical problem solving skills appropriate for her level of training.

Several other professors at UTMB, not named as Defendants in this lawsuit, also had an opportunity to observe and to evaluate Dr. Baldwin's performance. Those eval-

uations largely support the observations made by the Defendant faculty members. For example, Dr. Lisa Troyer, an assistant professor, evaluated Dr. Baldwin in November of 1994. In that evaluation, although Dr. Troyer stated that Baldwin had a good fund of knowledge, her surgical skills and decision making were not as strong. Dr. Troyer rated Baldwin's surgical skills as marginal at that time. Dr. Edward Yeomans, Chief of Division of Maternal Fetal Medicine at UTMB, also evaluated Baldwin. In his evaluation, dated November 24, 1994, Dr. Yeomans noted that Baldwin did not have a strong experience at Baylor and that her knowledge base in obstetrics was better than her clinical experience. In a memorandum to Dr. Jennings, dated February 7, 1995, Dr. Yeomans reports that after having had additional opportunities to observe Dr. Baldwin in labor and delivery, he felt that Baldwin needed remedial work in obstetrics in order to become a chief resident in the UTMB program. Finally, Dr. Leslie Powell, a clinical professor for obstetrics and gynecology, also evaluated Dr. Baldwin's performance. His first evaluation, although dated June 1, 1995, evaluated Baldwin's performance in December 1994 and January 1995. Dr. Powell rates her surgical skills as marginal and her acceptance of criticism as unsatisfactory. His comments included: "surgical technique is marginal; she seems unsure of herself at times," "Gets hostile to criticism," "Has chip on her shoulder." Defendants' Ex. 9–A. In a later evaluation in May of 1995, Powell rated her surgical skills as between marginal and average and her acceptance of criticism as marginal. Powell noted that she continued to accept criticism poorly and at times was reluctant to do a procedure in a certain way that was suggested or asked of her by the supervising physician. He recommended that Baldwin still be monitored closely on major cases.

Part of Dr. Jennings' responsibility as director of the residency program and as an assistant professor are to evaluate the residents' performance based upon his own observations and to give quarterly reviews to the residents. Jennings himself evaluated Baldwin for the first time in August of 1994. In that first evaluation, Jennings noted that "Susan is adapting to her program change and should manifest significant improvement in the months ahead." Based on his observations, he also rated Baldwin's surgical skills as marginal for her residency level. In preparation for Dr. Baldwin's quarterly performance review in October 1994, Jennings reviewed each of the evaluations submitted by the doctors who had worked with Baldwin during that period. Jennings noted that Dr. Baldwin was ranked as "average" by all evaluators. Some of the comments from the evaluating professors were: "She has some catching up to do," "overall knowledge base is weak," "Susan has poor surgical skills and requires a lot of teaching, she needs to be more open to criticism." At that time, Dr. Jennings encouraged Baldwin to study for in-service examinations and to continue in her attempt to improve her surgical skills.

Dr. Jennings second evaluation of Baldwin, dated January 26, 1995, rated Dr. Baldwin's surgical skills as unsatisfactory. Jennings further commented that, "Susan's surgical skills are lacking and she does not appear to have the initiative that it will take to overcome these difficulties." Jennings also noted that Baldwin was significantly behind the other students at her level. In preparation for Dr. Baldwin's second quarterly performance review, Jennings reviewed the faculty evaluations discussed above, finding lengthy evaluations regarding unsatisfactory performance, primarily in the area of surgical expertise. Furthermore, Baldwin's overall performance had been ranked as "marginal." Jennings discussed the faculty's evaluations with Baldwin[1] and wrote in her Quarterly Performance Review of February 1, 1995:

I have explained to Dr. Baldwin in a lengthy discussion that this type of performance warrants a non-renewal of contract in July 1995 and probationary status until

---

1. Baldwin disputes how many of the evaluations were actually addressed by Jennings at that meeting. Baldwin claims only Van Hook's, Held's, and possibly Sharp's evaluations were discussed. Jennings says that he presented all of the evaluations to Baldwin, but not all were discussed.

completion of the contract duration on June 30, 1995.

Defendants' Exhibit 1–G. Jennings based his quarterly review on the evaluations of the other doctors and upon his personal observation of Baldwin during two rotations.

On February 28, 1995, Dr. Jennings wrote a memorandum to Dr. Al LeBlanc, Associate Dean for Graduate Medical Education, regarding the non-renewal of Baldwin's contract and the terms of her probationary status. Jennings sent copies of the memorandum to Dr. Garland Anderson, Chairman of the UTMB OB–GYN Program, and to Dr. Baldwin. Jennings was required to notify LeBlanc and Anderson regarding Baldwin's current status. The Defendants deny Baldwin's claim that her evaluation was circulated among the OB–GYN faculty. However, the Defendants admit that they did occasionally discuss Baldwin's performance among themselves.

Dr. Anderson, as head of the OB–GYN department, upheld Jennings' decision on March 2, 1995. He had never had the opportunity to observe Baldwin's performance personally and therefore, had never submitted an evaluation of her skills. As a part of his review of Baldwin's status, Anderson met with Baldwin to discuss Jennings' decision not to renew her contract for the fourth year residency. Anderson also reviewed all of the faculty evaluation in Baldwin's file and personally spoke with Drs. Held, Sharp, Van Hook, Jennings, Yeomans, and Fulcher.[2] Based upon this investigation, he decided to uphold Jennings' decision not to renew Baldwin's contract for the fourth year.

On March 2, 1995, Dr. Jennings wrote a letter to Dr. O'Connor, the Executive Secretary for the Accreditation Counsel for Graduate Medical Education, requesting that he be allowed to go over his allotment of nine residents per year to accommodate a remediation program for Dr. Baldwin. He requested that she be able to enter the fourth post-graduate year in January 1996 with a completion date of December 31, 1996. This meant that UTMB would have ten residents for the third post-graduate year for the six month period from July 1995 to December 1995, and ten residents for the fourth post-graduate year from July 1996 to December 1996. After Jennings wrote to O'Connor, he received Baldwin's national testings scores (the "CREOG" scores). Baldwin's CREOG scores were in the 89 percentile nationally and the highest of all UTMB's third year residents.

On April 6, 1995, Jennings wrote a letter to Baldwin outlining the remediation arrangements that he was pursuing. He informed her of the request to O'Connor, an accommodation which would allow her to have an additional six months of remediation time. Jennings was also pursuing arrangements with Brackenridge Hospital in Austin, St. Joseph's Hospital in Houston, and University of Texas' affiliated Hospital in Harlingen for additional gynecology rotations. Upon satisfactory completion of the residency training, as determined by the established evaluation system, all negative evaluations accumulated during Baldwin's third year would be deleted from her record.

Baldwin did not accept Jennings' remediation offer. Instead, she appealed her status to Dr. LeBlanc. LeBlanc met with Baldwin on May 12, 1995, when she explained that her grievance was based on her opinion that the failure to reappoint and that the evaluations that led to that decision were racially biased. Dr. LeBlanc's investigation included, but was not limited to: an examination of Baldwin's complete personnel file, including faculty and chief resident evaluations, and her CREOG scores; interviews with faculty members who had worked with or evaluated Baldwin, as well as PGY4 chief residents; and, a review of the S–Form summaries for all other current PGY3 OB–GYN residents for both the aggregate of PGY1 and PGY2 experience as well as PGY3 procedural experience.[3]

---

2. Although Dr. Fulcher had never observed Dr. Baldwin's performance and, therefore, had never evaluated her, Dr. Baldwin specifically requested that he be included in Dr. Anderson's review as Dr. Fulcher was the only African–American OB–GYN faculty member.

3. The S–Form summary lists the number of surgical procedures performed by each resident during each year of their residency. See Defendants' Ex. 6–D.

Dr. LeBlanc found that the primary concerns of the faculty were about OB–GYN procedural and surgical proficiency, surgical judgment, and responsiveness to faculty direction. Dr. Baldwin's basic knowledge had not been a common concern in her evaluations, so the CREOG in-service exam scores did not change the evaluations. Dr. LeBlanc did not find any pattern of racial bias in the evaluations, rotational assignments, or technical learning opportunities. Concluding that there was no racial animus in the evaluations or in Jennings' decision not to renew Baldwin's contract, LeBlanc upheld the decision not to reappoint Dr. Baldwin.

Baldwin left UTMB on July 1, 1995, entering the third year residency program at St. Joseph's Hospital in Houston.

## II. SUMMARY JUDGMENT STANDARD

■ Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56. Rule 56(e) requires that when a motion for summary judgment is made, the nonmoving party must set forth set forth specific facts showing that there is a genuine issue for trial. *Id.; See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. ELEVENTH AMENDMENT IMMUNITY

■ The Eleventh Amendment bars any claims brought against a state or state agen-

cy unless Congress has abrogated the state's immunity or the state has expressly waived its immunity to suit in federal court. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). Congress must make its intention to abrogate the states' sovereign immunity "unmistakably clear in the language of the statute." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). Thus, as Congress failed to make any such intention clear in the statutory language, Congress did not abrogate the states' Eleventh Amendment immunity by enacting 42 U.S.C. §§ 1981, 1983, and 1985. *See, e.g., U.S. v. City of Yonkers,* 880 F.Supp. 212 (S.D.N.Y.1995), *vacated on other grounds by* 96 F.3d 600 (2nd Cir.1996). Additionally, under Texas state law, the Texas Tort Claims Act does not waive sovereign immunity for intentional torts, such as defamation. TEX.CIV.PRAC. & REM.CODE ANN. § 101.057; *City of Hempstead v. Kmiec,* 902 S.W.2d 118, 122 (Tex.App.—Houston [1st Dist.] 1995, no writ). Therefore, as the state of Texas has not consented to this suit, all claims against UTMB pursuant to §§ 1981, 1983, 1985 and state law defamation are barred by the state's sovereign immunity.[4] Accordingly, the Defendants' Motion for Summary Judgment against these claims is hereby **GRANTED,** and these claims are **DISMISSED WITH PREJUDICE.**

■ The Eleventh Amendment also shields state officials sued in their official capacity and bars all relief sought against official capacity defendants except prospective injunctive relief. "An official capacity suit against a state official 'is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the state itself.'" *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991) (citing *Will v. Michigan Dept. Of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989)). Accordingly, for the reasons stated above, all

---

**4.** As part of the University of Texas System, UTMB is a state agency. TEX.EDUC.CODE ANN.

§§ 65.02(a)(8), 74.001 (Vernon 1972 & Supp. 1995).

claims for monetary relief pursuant to §§ 1981, 1983, 1985 and defamation against the official capacity defendants, Drs. Anderson, Jennings, LeBlanc, Van Hook, Sharp, and Held, are also **DISMISSED WITH PREJUDICE** and Defendants' Motion for Summary Judgment as to those claims is hereby **GRANTED**. Whether the official capacity defendants have liability for prospective injunctive relief depends on the evaluation of Baldwin's intentional discrimination claims, discussed in Section IV., *infra.*

## IV. INTENTIONAL RACE DISCRIMINATION UNDER TITLE VI AND SECTIONS 1981 AND 1983

■ The Court's inquiry into intentional race discrimination is essentially the same for individual actions brought under §§ 1981 and 1983, Title VI and Title VII. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996); *Marcantel v. State of Louisiana, Dept. of Transportation and Development*, 37 F.3d 197, 198 (5th Cir.1994); *NAACP v. Medical Center, Inc.*, 657 F.2d 1322 (3d Cir. 1981). The Fifth Circuit applies the burden shifting analytic framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to analyze claims of intentional discrimination.[5]

■ Under the familiar *McDonnell Douglas/Burdine* framework, the Court employs a three-part test designed to determine the motivation of the defendant in taking the challenged action. *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817; *Burdine*, 450 U.S. 248, 101 S.Ct. 1089. First, the plaintiff is required to establish a *prima facie* case wherein she must establish the elements of the discrimination claim. If the plaintiff proves her *prima facie* case, a presumption of discrimination arises. *Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955 (5th Cir. 1993).

■ The burden of production then shifts to the defendant to rebut this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory ac-

tion. *Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471 (5th Cir.1992), *cert. denied*, 507 U.S. 909, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993). A defendant meets this burden by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the defendant. *Guthrie v. Tifco Indus.*, 941 F.2d 374, 376 (5th Cir.1991), *cert. denied*, 503 U.S. 908, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992). The defendant need not *persuade* the trier of fact that there was no intentional discrimination; she need only produce evidence on that point. *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747.

■ Third, once the defendant satisfies this burden, the presumption of discrimination established by the plaintiff's *prima facie* case dissolves. *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. The plaintiff's burden of persuasion then arises, and the plaintiff must produce evidence that the defendant's proffered reasons are mere pretexts, the real reason for the action having been based on an impermissible animus. *Id.* at 256, 101 S.Ct. at 1095; *Bodenheimer*, 5 F.3d at 959. She may succeed in this either by persuading the Court that a discriminatory reason more likely motivated the defendant or by showing that the defendant's reason is unworthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The ultimate burden of proof of intentional racial discrimination rests at all times on the plaintiff. *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2749.

■ Summary judgment is particularly appropriate when the Court is evaluating the evidence at the "pretext" stage of the *McDonnell Douglas* analysis.

[I]t is relatively easy both for a plaintiff to establish a *prima facie* case and for a defendant to articulate a legitimate, non-discriminatory reason for his decision.... In the context of summary judgment ..., the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext.

---

**5.** *McDonnell Douglas* was refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981),

and recently clarified in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

*Britt v. The Grocer's Supply Co. Inc.,* 978 F.2d 1441, 1450 (5th Cir.1992), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2929, 124 L.Ed.2d 679 (1993), *quoting, Amburgey v. Refractories Corp.,* 936 F.2d 805, 811 (5th Cir.1991). Speculation and belief are insufficient to create a fact issue as to pretext. *Britt,* 978 F.2d at 1451. Nor can pretext be established by mere conclusory statements of a plaintiff who feels that she has been discriminated against. *E.E.O.C. v. Exxon Shipping Co.,* 745 F.2d 967, 976 (5th Cir.1984).

▇▇ ·The Plaintiff here has presented evidence to support a *prima facie* case of intentional discrimination. As an African American woman, Susan Baldwin is a member of a protected class. Her high CREOG scores support her argument that she was qualified to have her contract renewed. Despite her test scores, Baldwin's contract was not renewed, and instead, remediation was recommended. At the same time, all of the other PGY3 residents' contracts were renewed that year. Therefore, as Plaintiff has stated a *prima facie* case, the Defendants must produce evidence to rebut the presumption of discrimination in order to prevail on summary judgment.

▇▇ The Defendants have met their burden of production in this case. Each of the evaluating doctors, Van Hook, Sharp, Held and Jennings, made professional observations regarding Dr. Baldwin's performance and found that she had unsatisfactory to marginal surgical skills, was unreceptive to constructive criticism, and that her overall performance was unsatisfactory to marginal. These evaluations, together with the S–Form summaries, clearly indicate that Baldwin did not have the same level of surgical experience and skill as the other PGY3 residents. Furthermore, this Court refuses to second guess the academic decisions of medical doctors as to Susan Baldwin's surgical skills. The Court has quite enough of its own professional responsibilities without undertaking the micro-management of a medical school. The Court, therefore, finds that Drs. Van Hook, Sharp, Held and Jennings have articulated a legitimate, nondiscriminatory reason for the decision not to renew Susan Baldwin's contract, and instead, to remediate her training.

▇▇ The reviewing doctors, LeBlanc and Anderson, likewise have met their burden of production on this matter. Dr. Baldwin claims that LeBlanc and Anderson adopted the faculty's, in particular Dr. Van Hook's, racist views in upholding Dr. Jennings' decision. Both LeBlanc and Anderson individually reviewed all written evaluations and the number of procedures performed, spoke with evaluating faculty members, and interviewed Baldwin herself. Based on these investigations, in their professional judgment, both doctors upheld Dr. Jennings' decision. Again, the summary judgment evidence produced clearly supports the nondiscriminatory reason offered by the Defendants, *i.e.,* that the decision to not renew Susan Baldwin's contract and to remediate her were based on her level of surgical skills.

▇▇ Dr. Baldwin attempts to show that the reasons offered by the Defendants are mere pretexts for racial animus. Specifically,[6] she points to the use of the word "innate"

---

**6.** The Court uses this term loosely in describing Plaintiff's submission to this Court. It is this Court's opinion that the Plaintiff's Response is a better example of stream of consciousness writing than any form of legal argument. The first eleven pages of Plaintiff's brief directly quote her Complaint; the next five pages randomly cite various textbooks on racism, followed by ten pages haphazardly discussing Plaintiff's CREOG scores and the CREOG scores of the other residents; finally, the last ten pages ramble on pointlessly about the use of the word "innate." The Court is not impressed by expansive, impassioned gibberish. It is impressed by coherent factual and legal argument, something completely lacking in Plaintiff's Response. In fact, the Plaintiff makes absolutely no response to many of the arguments made by the Defendants in their Motion for Summary Judgment. Consequently, in those respects, the Court treats the Defendants' Motion as unopposed. As to the Plaintiff's request for additional time to respond to the unanswered arguments, the Court is unimpressed and unmoved by counsel's explanation that his understanding was that dispositive motions were to be limited to immunity issues (especially given that counsel makes no response to the Defendants' immunity arguments). The Court has historically and will always entertain any dispositive motion as soon as there is evidence available to support such a motion. Such artificial constraints limit the efficiency of this Court in managing one of the largest civil dock-

by Dr. Van Hook in her evaluation dated February 1, 1995. Baldwin argues that the word "innate" means "genetic" and then equates "genetic" with "race." These leaps of inference are without evidentiary basis and without logical basis as well. Even if the Court grants, *arguendo,* the premise that innate means "genetic" or "in the blood," there is simply nothing that supports the logical leap that *Dr. Baldwin's* teachability has anything to do with the teachability of Dr. Baldwin's *race.* Dr. Baldwin could have used the same logic to claim that Van Hook had discriminated against her because she was a woman, for surely Dr. Baldwin's gender is innate as well. There is simply no end to the character traits that are possibly gene-linked. Thus, Baldwin's argument on this point does not persuade the Court that a discriminatory reason more likely motivated the Defendants, nor does it persuade the Court that the Defendants' reason is unworthy of credence. In fact, it is the Plaintiff's argument that lacks credulity here.

Baldwin also points to her high CREOG test scores in her attempt to show that the Defendants' actions were really motivated by racial animus. However, Plaintiff's exam scores only serve to support her *prima facie* case here. The Defendants acknowledge Dr. Baldwin's general knowledge level. In fact, it was their faith in that knowledge level that caused them to believe that remediation would be worthwhile in Dr. Baldwin's case. However, as Dr. LeBlanc noted in his review, the faculty's concerns were largely focused on Baldwin's surgical proficiency and surgical judgment. In fact, more than one evaluator commented that Baldwin's surgical skills were not as strong as her general level of knowledge and that her general level of knowledge did not translate to clinical problem solving skills appropriate for her level of training. In short, the Defendants' evidence supports that their decision rested on Baldwin's lack of surgical skills, not a lack of testing skills or general medical knowledge. Plaintiff's evidence regarding her CREOG

scores has not persuaded the Court otherwise.

The Plaintiff also points out that she was the only resident whose contract was not renewed that year. Baldwin argues that because her CREOG scores were higher than all of the other UTMB residents in her program, the Defendants' decision was more likely motivated by racial animus than by her abilities. This argument is a complete *non sequitur* for the reason articulated above, *i.e.,* that Baldwin's CREOG scores were not indicative of her clinical surgical skills, upon which the Defendants' decision was based. Furthermore, the Plaintiff presents evidence which undercuts her own argument that the other residents were similarly situated. In fact, as the residents' evaluations show, none of the other residents were similarly situated to Dr. Baldwin. Their evaluations do not compare to the overwhelming number of similar comments regarding Baldwin's surgical skills and acceptance of criticism made by the faculty in Baldwin's evaluations. In her presentation of the other residents' evaluations, Baldwin takes negative comments out of context and ignores positive statements. In no way do isolated negative comments or one bad evaluation compare to Dr. Baldwin's situation where she consistently received overwhelmingly bad evaluations by virtually the entire faculty. Therefore, the Court is not persuaded that this evidence presented by the Plaintiff shows that the Defendants' were more likely motivated by racial animus.

■ Finally, the Plaintiff offers the fact that Dr. Fulcher, the only African–American on the OB–GYN faculty was not sent an evaluation form to fill out is suggestive of racial animus. Yet, the evidence shows that Dr. Fulcher could have picked up an evaluation form at any time. He did not because he had not personally observed Dr. Baldwin's performance. In fact, Drs. Anderson and LeBlanc made a point to interview Dr. Fulcher prior to making their final decisions. Therefore, the fact that Fulcher did not fill out a performance evaluation for Baldwin

ets in the United States. The Court refuses to be so constrained and suggests that in the future, counsel actually take the time and effort to thoughtfully respond to Defendants' arguments

in his Response, rather than cobbling together dozens of pages of inane drivel, calculated to do nothing more than evade, obfuscate and confuse the issues at hand.

does not persuade the Court that the Defendants' actions were more likely motivated by racial animus rather than by their professional judgment of Baldwin's surgical skills.

As Plaintiff has presented no other evidence to support her argument that the Defendants' offered reasons are mere pretexts for racial animus, the Plaintiff has not carried her burden in this case. The Defendants have offered a legitimate non-discriminatory reason for their decision not to renew Susan Baldwin's contract and to remediate her medical training. The Court has not found any fact issues regarding the issue of pretext which would preclude summary judgment at this time. Speculation and belief are insufficient to create a fact issue as to pretext. Nor can pretext be established by mere conclusory statements of a plaintiff who feels that she has been discriminated against. Plaintiff's evidence here essentially amounts to speculation and conclusory statements of a plaintiff who feels she has been discriminated against. Accordingly, the Defendants' Motion for Summary Judgment is hereby **GRANTED** as to Plaintiff's claims pursuant to §§ 1981 and 1983 against the individual Defendants Anderson, Jennings, LeBlanc, Van Hook, Sharp and Held. Furthermore, the Defendants' Motion for Summary Judgment is hereby **GRANTED** as to the Plaintiff's Title VI claims against the Defendant UTMB.[7] All claims for monetary and injunctive relief pursuant to these statutory provisions are **DISMISSED WITH PREJUDICE.**

### V. SECTION 1985 CONSPIRACY CLAIM

■ A single legal entity, such as UTMB and its employees, is incapable of conspiring with itself for the purposes of § 1985. *See Hilliard v. Ferguson,* 30 F.3d 649, 653 (5th Cir.1994). It is a longstanding rule in the Fifth Circuit that "a corporation cannot conspire with itself anymore than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Hilliard,* 30 F.3d at 653 (citing *Nelson Radio and Supply Company v. Motoro-*

*la, Inc.,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953)). The Fifth Circuit and several district courts within the Circuit have applied this "intracorporate conspiracy" doctrine to entities other than corporations. *See, e.g., Hilliard,* 30 F.3d at 653 (finding that the doctrine applied to a school board and its members); *Moody v. Jefferson Parish School Board,* 803 F.Supp. 1158, 1166 (E.D.La.1992) (school board, principal, vice-principal, and various teachers are all employed by the Jefferson Parish School Board and, thus, are a single entity), *aff'd,* 2 F.3d 604 (5th Cir.1993); *Hankins v. Dallas Independent School District,* 698 F.Supp. 1323, 1330 (N.D.Tex.1988) (high school and its officials constitute a single entity); *Chambliss v. Foote,* 421 F.Supp. 12, 15 (E.D.La.1976) (university and its officials considered a single legal entity), *aff'd,* 562 F.2d 1015 (5th Cir. 1977), *cert. denied,* 439 U.S. 839, 99 S.Ct. 127, 58 L.Ed.2d 137 (1978).

■ All of the individual Defendants here are employees of UTMB. Therefore, for the purposes of Plaintiff's § 1985 conspiracy claim, UTMB and its employees constitute a single legal entity which is incapable of conspiring with itself. Accordingly, the Defendants' Motion for Summary Judgment as to Plaintiff's § 1985 claims against all of the individual Defendants is **GRANTED,** and these claims are hereby **DISMISSED WITH PREJUDICE.**

### VI. STATE LAW DEFAMATION CLAIM

Dr. Baldwin claims that her quarterly performance review was circulated amongst the OB–GYN faculty and that publication worked to discredit her and caused others to question her abilities. The Defendants deny that the quarterly performance review was circulated, but admit that the faculty did on occasion discuss Baldwin's performance amongst themselves. The Defendants argue that these communications are privileged.

---

**7.** As the recipient of federal funds, UTMB is the only possible defendant under Title VI. Therefore, to the extent Plaintiff has pled Title VI claims against the individual Defendants, those claims are also hereby **DISMISSED WITH PREJUDICE.**

To sustain her defamation claim, Baldwin must show that the Defendants published defamatory material about her in the quarterly performance review which injured or impeached her reputation. *Schauer v. Memorial Care Systems*, 856 S.W.2d 437, 446 (Tex.App.—Houston [1st Dist.] 1993, no writ). Whether a document is reasonably capable of a defamatory meaning is an issue of law for the court. *Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653, 654–55 (Tex.1987). Thus, the question is particularly ripe for summary judgment. *Schauer*, 856 S.W.2d at 446.

To determine whether a publication is defamatory, the Court must look at the entire communication and not separate sentences or portions. *Id.; Musser*, 723 S.W.2d at 655. "Statements may not be made defamatory by taking them out of context." *Schauer*, 856 S.W.2d at 446, *citing Raymer v. Doubleday & Co.*, 615 F.2d 241, 245 (5th Cir.1980), *cert. denied*, 449 U.S. 838, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980). An expression of opinion is protected free speech. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex.1989). The question of whether a communication is a protected expression of opinion or an actionable assertion of fact is a question of law to be decided by the Court. *Id.* at 570.

The evaluations and quarterly performance reviews prepared by the individual Defendants in this case are clearly expressions of their opinion of Plaintiff's performance while working under their supervision. First of all, the evaluation form used by the faculty indicates that the faculty should make an evaluation based on their own observations and opinions of the resident's performance. For example, the first section of the evaluation asks the professor to "Circle your rating for each category" (emphasis added) followed by a list of skills and attributes including "General Knowledge Base," "Surgical Skills," "Clinical Problem Solving," "Acceptance of Criticism," and "Overall Performance." Clearly, these ratings are simply statements of a supervising physician's opinion and are not defamatory as a matter of law. Other sections of the evaluation form ask the professors for comments and recommendations, areas of deficiency which the Program Director should discuss with the resident, and specifically, "In your opinion, at this time, should this resident continue training in obstetrics and gynecology?" (emphasis added). Again, the doctors' responses in this case clearly reflect their own opinions of Dr. Baldwin's abilities based on their own observations of her performance. Thus, after a thorough review of the performance evaluations relevant to this case, the Court concludes that the statements complained of within these evaluations are permissible expressions of opinion and are not defamatory as a matter of law. Furthermore, as the quarterly performance reviews prepared by Dr. Jennings are no more than a summary of the faculty evaluations and statistics regarding the actual number of procedures performed by the resident, they also fall under the umbrella of protected free speech and not defamatory as a matter of law.[8]

Furthermore, accusations or comments about an employee by her employer, made to a person having an interest or duty in the matter to which the communication relates, have a qualified privilege. *Schauer*, 856 S.W.2d at 449; *see also Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 630 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) Whether a communication has qualified privilege is a question of law for the Court. *Schauer*, 856 S.W.2d at 449.

The privilege is not lost, so long as one believes the truth of the communication. Substantial truth is sufficient. A communication loses its privilege if it was made with malice or want of good faith.

*Id.* Once the Court finds that a party has qualified privilege, the plaintiff can overcome it only by a showing of actual malice. *Id.* Where statements are cloaked with a qualified privilege, the law presumes good faith

---

8. Moreover, to permit such claims in this environment would cast an appalling chill over candor in medical education. Professors *must* be free to exercise precise and insightful judgment, so that doctors may be properly trained, and the public will not be victimized by the incompetence which would invariably flow from timid evaluations.

and lack of malice. *Id.; Marathon Oil*, 682 S.W.2d at 630.

 In this case, the evaluations made by the individual Defendants are also protected by a qualified privilege. The Defendants prepared the performance evaluations of Baldwin as a part of their supervisory duties. These evaluations contain the comments about a UTMB employee, Dr. Baldwin, and were directed to Dr. Jennings, who had a duty and an interest with regard to Dr. Baldwin's performance in the residency program. Likewise, Drs. Anderson and LeBlanc had a duty and an interest with regard to Baldwin's performance in the residency program. Therefore, because the performance evaluations contained comments about an employee made by her supervisors to a person having an interest or a duty in the matter to which the communication relates, the statements in the performance evaluations have a qualified privilege.

 The Plaintiff cannot overcome the presumption of good faith and lack of malice to defeat qualified privilege here. Summary judgment is appropriate where a plaintiff has advanced no clear and convincing evidence of actual malice. *Casso v. Brand*, 776 S.W.2d 551, 559 (Tex.1989). Absent such an offering of "clear and convincing affirmative proof" by the non-movant, summary judgment is warranted. *Id.* at 558–59. The Defendants' affidavits establish there was no actual malice. Dr. Baldwin has not offered any clear and convincing affirmative proof to overcome her burden. Therefore, the Court concludes that to the extent that the statements complained of are not permissible expressions of opinion, they are protected by qualified privilege. Accordingly, Defendants' Motion for Summary Judgment as to the Plaintiff's state law defamation claims is hereby **GRANTED,** and those claims are **DISMISSED WITH PREJUDICE.**

## VII. CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment is hereby **GRANTED** and all claims are **DISMISSED WITH PREJUDICE.** Furthermore, the Court assesses taxable costs against the Plaintiff. Therefore, in accordance with Rule 4 B of the Local Rules of the Southern District of Texas, the Defendants are **ORDERED** to file a Bill of Costs within ten (10) days after the entry of Final Judgment. Any objections by the Plaintiff must be filed within five (5) days after the filing of the Bill of Costs. If there are no objections, the costs will be assessed by the Clerk of Court. Upon receipt of objections to the Bill of Costs, the Court will rule on the matter or, if further information is required, may order a hearing or direct the parties to further brief the issue. Any costs awarded by this Court will strictly conform with the limits set forth in 28 U.S.C. § 1920. Therefore, to avoid unnecessary delay and debate, the Court encourages the Defendants to carefully scrutinize their costs and submit only those clearly authorized by section 1920.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons set forth in the Order issued this date, Defendants' Motion for Summary Judgment is **GRANTED** and all claims are hereby **DISMISSED WITH PREJUDICE.** Furthermore, the Court assesses taxable costs against the Plaintiff. Therefore, in accordance with Rule 4 B of the Local Rules of the Southern District of Texas, the Defendants are **ORDERED** to file a Bill of Costs within ten (10) days after the entry of Final Judgment. Any objections by the Plaintiff must be filed within five (5) days after the filing of the Bill of Costs. Upon receipt of objections to the Bill of Costs, the Court will rule on the matter or, if further information is required, may order a hearing or direct the parties to further brief the issue.

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**