Todd **MILLER**, Plaintiff,

v.

Harvey **BUNCE**, III, et al., Defendant.

No. Civ.A. G–98–382.

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 19, 1999.

Mary L. Sinderson, Dameris and Kuniansky, Houston, TX, Gaines F. West, II, West Webb Allbritton & Gentry, College Station, TX, for plaintiff.

Christopher N. Johnsen, Office of Attorney General, Austin, TX, Terence L. Thompson, Office of Attorney General, Austin, TX, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

In this action, Plaintiff Todd Miller brings suit against eight University of Texas Medical Branch faculty members, Harvey Bunce, III, George Bernier, Billy Philips, Daniel Freeman, James Grady, Kyriakos Markides, Walter Meyer, and James Hokanson, in their official capacities, for alleged violations of his First, Fourth, and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983, and for violations of the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h). With the exception of George

Bernier, Plaintiff also sues each of the Defendants in their individual capacities for these same alleged violations. Additionally, he sues Defendants Freeman, Grady, Philips, and Hokanson for defamation/slander. Now before the Court are Defendants' Motion to Dismiss and Motion for Summary Judgment. For the reasons stated below, the Motion for Summary Judgment is **GRANTED** and the Motion to Dismiss is therefore **MOOT.**

## I. FACTS

Plaintiff, Dr. Todd Miller, joined the Department of Preventive Medicine and Community Health ("PMCH") at the University of Texas Medical Branch in Galveston ("UTMB") as a faculty member in 1991. He holds a tenure track position with a nine year period in which to apply for and receive tenure.

In June 1995, Plaintiff received a $100,-000 grant to conduct research from the National Institutes of Health ("NIH"). Under the terms of the grant, part of the grant money was to be used to fund ten percent of the salaries of Defendants Grady and Freeman. Grady and Freeman are professors and biostatisticians in PMCH who had assisted Plaintiff in the grant application process.

Almost as soon as the grant became effective, Plaintiff complains that he experienced problems working with Defendants Grady and Freeman. He alleges that they failed to perform required work on the grant for a period of time (precisely how long is unclear from Plaintiff's summary judgment brief), yet they accepted salary support for the allegedly inadequate work. At some point, Plaintiff wrote a letter to Defendant Freeman asking him to investigate the work he and Defendant Grady had or should have performed. Both Freeman and Grady were upset by the letter, and Dr. Freeman complained to Defendant Markides, Plaintiff's supervisor at the time. Freeman, Grady, Markides, and Plaintiff met on January 5, 1996, to discuss the problems that had arisen, but the meeting ended unsuccessfully. Subsequently, Freeman apparently resigned from the grant. Plaintiff then complained to Defendant Bunce, Department Chair of PMCH, about Freeman's having received salary support for work he performed inadequately or not at all. Bunce apparently concluded that Freeman had performed the required work adequately, although Plaintiff alleges that Bunce did not supply satisfactory evidence to support his conclusion. When the grant came up for renewal in May 1996, Plaintiff refused to sign the grant renewal form because it required him to verify Freeman's time commitment. Plaintiff then apprised NIH's Office of Management Assessment of the problem, but they had no interest in pursuing the matter and encouraged him, as did Defendant Bunce, to sign the grant renewal.

Apparently, Defendant Grady remained on the grant for some period of time after Freeman had resigned, but did not perform tasks to Plaintiff's satisfaction. At one point, Plaintiff "suggest[ed] corrections and updates to the partially complete work Defendant Grady had done," which allegedly aggravated Grady to the point that he resigned from the grant. Grady also allegedly attempted to demote Plaintiff from second author to third author on a manuscript the two were going to submit for publication, but Defendant Meyer, the scientific integrity officer, reinstated Plaintiff as second author. Eventually, Dr. Rosenblatt, another statistician, was assigned to Plaintiff's project at no charge. Plaintiff complained that Rosenblatt was unqualified to do the work, and ultimately Rosenblatt was removed from the grant without a replacement, leaving Plaintiff without the statistical support necessary to complete the grant project.

In January 1997, Meyer informed Plaintiff he would take no further action on Plaintiff's reports of misuse of grant monies. Plaintiff then filed a second complaint with NIH, but apparently NIH again chose to take no action.

During and following the occurrence of these various problems, Plaintiff (not surprisingly) alleges that he experienced diffi-

culty working with several of his other colleagues, including his supervisor, Defendant Markides, who allegedly refused to work on projects they had previously discussed developing together. Plaintiff complains that Markides and Bunce also failed to adequately support Plaintiff in his attempts to seek committee appointments and tenure. Despite these problems, however, Plaintiff was promoted to Assistant professor in September 1997.

At some point prior to Plaintiff's submission of his application for tenure, Defendant Philips, Director of the Division of Epidemiology and Biostatistics within PMCH, allegedly told the department faculty that the rules of the Appointments, Promotion, and Tenure Committee ("APT Committee") process needed to be changed. In June 1997, the APT procedures were revised while Plaintiff's tenure application, submitted to Defendant Markides in May 1997, was pending. Plaintiff alleges that the changes made were specifically intended to injure Plaintiff's chances for obtaining tenure. Plaintiff also complains that the various actions of Defendants compromised his tenure evaluation for a variety of reasons including the fact that he was "forced" to file an incomplete final report with NIH. He argues that the Defendants' actions and inaction were in retaliation for his investigation and reporting of what he terms "grant fraud" pertaining to the allegedly inadequate work performed on the NIH grant.

## II. STANDARD OF ANALYSIS

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Rule 56(e) requires that when a motion for summary judgment is made, the nonmoving party must set forth set forth specific facts showing that there is a genuine issue for trial. *Id.; see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly sup-

ported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *Id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. ANALYSIS

### A. Due Process Claims

■ The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend XIV. To state a claim under Section 1983 for a violation of due process, Plaintiff must first prove that he was deprived of a constitutionally protected life, liberty, or property interest, and then identify an official action that caused the constitutional deprivation. *See Johnson v. Houston Indep. Sch. Dist.,* 930 F.Supp. 276, 285 (S.D.Tex.1996) (citing *Blackburn v. City of Marshall,* 42 F.3d 925, 935 (5th Cir.1995)).

■ Plaintiff has utterly failed to identify a liberty or property interest of which he has been deprived. In a nutshell, Plaintiff complains that because he was denied certain committee appointments, and certain research, publishing, and lecturing opportunities, and because his tenure application was delayed, his "chances for tenure" were unlawfully denied and his ability to find employment elsewhere has been severely limited. Plaintiff, however, has neither a property nor a liberty interest in his "chances for tenure" or an unblemished professional reputation to support a claim for violation of due process.

Plaintiff argues that "a mutual understanding between him and UTMB that a professor has nine years to acquire tenure," arising from the guidelines of

UTMB's faculty handbook, creates a legally protected interest in the amorphous concepts of "chances for tenure" and an unblemished professional reputation. This contention is utterly unsupported by either the law or the language of the handbook. The United States Court of Appeals for the Fifth Circuit has specifically held that under Texas law a university's faculty handbook does not generally create a property interest in the continued employment of a professor or his promotion to tenure after successfully serving his probationary term. *See Spuler v. Pickar,* 958 F.2d 103, 106–07 (5th Cir.1992). It is axiomatic, then, that such a handbook cannot be the basis for a property or liberty interest in certain ill-defined conduct by Plaintiff's academic colleagues that he believes would most benefit him in obtaining tenure. Moreover, Plaintiff has retained his job, thus he has not even been denied what the faculty handbook offers him—nine years to acquire tenure. And with respect to Plaintiff's "stigma" claim, courts have been equally clear that no protected interest exists in an unblemished professional reputation. *See, e.g., Silva v. Worden,* 130 F.3d 26 ("Despite the 'drastic effect of the 'stigma' ... reputation alone, apart from some more tangible interests ..., is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause.' ") (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976)).

Plaintiff also alleges a violation of procedural due process; however, as Plaintiff has failed to identify a property or liberty interest which is entitled to the protection of procedural due process, this claim is as insupportable as his substantive due process claims. Accordingly, Defendants' Motion for Summary Judgment on all of Plaintiff's due process claims is hereby **GRANTED** and those claims are **DISMISSED WITH PREJUDICE.**

*B. False Claims Act Retaliation Claims*

Plaintiff states that Defendants, by allegedly interfering with and failing to support his pursuit of tenure, were acting in retaliation against him for his attempts to investigate and expose what he terms "grant fraud." He brings a claim against Defendants in their individual and official capacities pursuant to the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h), which provides:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in their terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. . . .

■■■ As an initial matter, Plaintiff's claims against Defendants as individuals must be dismissed as Defendants do not fall within the definition of "employer," as required by the statute, while acting in their individual capacities. *See United States ex rel. Wilkins v. Ohio,* 145 F.3d 1333 (6th Cir.1998) (unpublished opinion with text at 1998 WL 279375) (citing *Wilkins ex rel. United States v. Ohio,* 885 F.Supp. 1055 (S.D.Ohio 1995)); *U.S. ex rel. Lamar v. Burke,* 894 F.Supp. 1345 (E.D.Mo.1995); *Clemes v. Del Norte County United School Dist.,* No. C–93–1912, 1996 WL 331096, at *7, n. 6, (N.D.Cal. May 28, 1996). Additionally, the claims for monetary relief against Defendants in their official capacities must be dismissed as the Eleventh Amendment bars such claims. *See Hudson v. City of New Orleans,* 174 F.3d 677, 680 (5th Cir.1999) (for purposes of Eleventh Amendment immunity to suit in federal court, courts do not distinguish between suits brought against a state entity and suits brought against that entity's officers except when a plaintiff seeks prospective relief against an officer in his official capacity); *see also United States ex rel. Foulds v. Texas Tech University,* 171 F.3d 279 (5th Cir.1999)

(Eleventh Amendment protections apply to claims brought under the False Claims Act). All that remains of Plaintiff's retaliation claim, then, is an action against Defendants in their official capacities for injunctive relief including "the granting of tenure, the opportunity to enjoy the full benefits and privileges of his position, reinstatement of teaching and curriculum development, equal access to data, staff support, appropriate secondary appointments, research opportunities and other opportunities granted to all other members of PMCH with similar rank or position."

The conduct Plaintiff engaged in clearly fails to bring him within the ambit of the False Claims Act's retaliation provision, which requires that the employee acted "in furtherance of an action under [the False Claims Act]." The Act contemplates that a plaintiff acts in furtherance of a *qui tam* action, even if that action is never in fact filed or the plaintiff ultimately is found not to have standing. However, in the instant case, Plaintiff has neither filed a *qui tam* action against the state for "grant fraud," nor has he ever had any intention of doing so. This is apparent since the last action he took on the matter was his report to NIH in May, 1997. Nevertheless, he argues that because he may once have made reference, in conversation with Defendant Bunce, to scientific misconduct and illegal activity pertaining to the NIH grant, he should be covered by the statute. On these facts—some petty squabbles among colleagues about the amount of work done on a grant—it is beyond conceivable that Defendant Bunce or any of the other Defendants understood Plaintiff to actually be threatening an action under the False Claims Act. In fact, when Plaintiff filed a complaint with NIH the first time, NIH informed him that they had little interest in investigating the matter as it is nearly impossible to police the work of grantees who receive only a small percentage of a grant's funds. In light of NIH's response, especially, it is the height of ridiculousness to suggest that anyone would have understood Plaintiff's complaints to imply that he would go to the trouble and expense to file a suit in federal court on behalf of the government to recover the pittance that he alleges was misused. The False Claims Act retaliation allegation is just one more attempt by Plaintiff's lawyer to create a cause of action, where none exists, in the misguided hope that overwhelming the Court with frivolous accusations will lead to some recovery.

The Court cannot turn to other matters without a comment regarding the outrageousness of the relief sought by Plaintiff—namely his request for "the granting of tenure, the opportunity to enjoy the full benefits and privileges of his position, reinstatement of teaching and curriculum development, equal access to data, staff support, appropriate secondary appointments, research opportunities and other opportunities granted to all other members of PMCH with similar rank or position." Because Plaintiff has not learned to play well with others, he essentially asks that the Court supervise his colleagues to make sure that they are nice to him. The Court has neither the personnel nor even the most remote interest in assuming the task of babysitting Plaintiff and his colleagues at PMCH. Micromanaging Plaintiff's workplace is hardly the province of this Court, and, frankly, the Court resents the amount of time Plaintiff has now forced it to expend in just that sort of exercise.

### C. First Amendment Retaliation Claim

Plaintiff's next claim is that he was retaliated against for exercising his rights under the First Amendment. He alleges that the Defendants conducted a "campaign of reprisal" against him for his speech pertaining to "grant fraud." In order to establish a *prima facie* case for retaliation based upon the exercise of First Amendment rights, Plaintiff must show by a preponderance of evidence, that: (1) his speech was protected, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected speech and the adverse employment action. *See Mount Healthy City Sch.*

*Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977).

■ Assuming, arguendo, that Plaintiff's self-serving complaint that his colleagues were not performing adequate work on his grant rises to the level of protected speech, Plaintiff's evidence clearly fails the second prong of the test. He has not alleged a single adverse employment action—discharge, demotion, refusal to hire, refusal to promote, or receipt of a reprimand—recognized by the Fifth Circuit as actionable adverse employment actions. *Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 319 (5th Cir.1997); *Sharp v. City of Houston,* 164 F.3d 923, 932–33 (5th Cir. 1999). Instead, he alleges more than one hundred and fifty trivial acts of retaliation in an apparent attempt to persuade the Court that the whole is greater by vast proportions than the sum of its parts. However, a laundry list of petty complaints (no matter how excruciatingly lengthy), where the most significant complaint is a delay in consideration of his tenure application, is insufficient as a matter of law to rise to the level of adverse employment actions articulated by the Fifth Circuit. *See Pierce v. Texas Department of Crim. Justice, Inst. Div.,* 37 F.3d 1146, 1149 (5th Cir.1994) (citing *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994)) (declining to expand the list of actionable adverse actions, noting that some things are not actionable even though they have the effect of chilling the exercise of free speech); *see also Harrington v. Harris,* 118 F.3d 359, 365–66 (5th Cir.1997). This is especially true where, as here, the overwhelming majority of the Plaintiff's complaints are substantiated only by the Plaintiff's self-serving testimony. Accordingly, Plaintiff's First Amendment claim is **DISMISSED WITH PREJUDICE.**

## D. *Defamation*

Plaintiff's last claim is brought against three of the Defendants for defamation. The following is a short summary of the allegedly defamatory remarks: Defendant Philips said to Dr. Richard Evans that Plaintiff was litigious; Defendant Philips allegedly said that Plaintiff had poor teaching evaluations and lacked the appropriate skills to teach the behavior change lecture that Plaintiff had given in the past; Defendant Grady said Miller had poor leadership skills and that he could no longer work with him; Defendants Philips and Freeman made statements denigrating Plaintiff's professional abilities.

■ A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. *See* Tex.Civ.Prac. & Rem.Code Ann. § 73.001; *Cain v. Hearst Corp.,* 878 S.W.2d 577, 580 (Tex.1994). Slander is a defamatory statement orally published to a third party without explanation or excuse. *See Cain,* 878 S.W.2d at 580. A slanderous remark is published if it is orally communicated to a third person capable of understanding its defamatory meaning and in such a way that the person did understand its defamatory meaning. *See AccuBanc Mortgage Corp. v. Drummonds,* 938 S.W.2d 135, 147 (Tex.App.—Fort Worth 1996, writ denied). Whether any statement or document is reasonably capable of a defamatory meaning is an issue of law for the Court. *See Baldwin v. University of Texas Medical Branch at Galveston,* 945 F.Supp. 1022, 1035 (S.D.Tex.1996), *aff'd,* 122 F.3d 1066 (5th Cir.1997). Moreover, certain defamatory statements are privileged under Texas law. *Id.* at 1035–36.

■ None of the statements Plaintiff complains of are corroborated by anyone other than Plaintiff himself. He offers no testimony from the persons to whom allegedly derogatory statements were made. This evidentiary insufficiency alone provides a sufficient basis for granting Defendants' Motion for Summary Judgment. However, even if Plaintiff's allegations had evidentiary support, Plaintiff's claim still fails as a matter of law. The statements allegedly made by Defendants constitute nothing more than the personal opinion of colleagues in the work environment, which, while critical, are protected free expres-

sion. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's defamation claims is hereby **GRANTED** and those claims are **DISMISSED WITH PREJUDICE.**

### III. CONCLUSION

In accordance with the reasoning outlined above, Defendants' Motion for Summary Judgment is **GRANTED.** Plaintiff has utterly failed to establish a fact issue as to any deprivation of his Constitutional rights thus all of his Constitutional claims are **DISMISSED WITH PREJUDICE** against all Defendants. He has also failed to establish that his conduct brings him within the ambit of the False Claims Act, thus those claims are also **DISMISSED WITH PREJUDICE.** Finally, Plaintiff has failed to raise a fact issue as to his allegations of defamation, thus those claims are also **DISMISSED WITH PREJUDICE** against all Defendants. Furthermore, Plaintiff is hereby **ORDERED** to file nothing further regarding the issues addressed in this Order, including motions to reconsider and the like, unless supported by *compelling* new evidence not available at the time of the instant submissions. Instead, Plaintiff is instructed to seek any further relief to which he may feel he is entitled, on any matter herein addressed, from the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons stated in the Court's Order entered this date, Defendants' Motion for Summary Judgment is **GRANTED** and all claims against Defendants are **DISMISSED WITH PREJUDICE.** The parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date.

**IT IS SO ORDERED.**