**J. David BESSMAN**

v.

**Don W. POWELL, et al.**

**Civil Action No. G–97–001.**

United States District Court,
S.D. Texas,
Galveston Division.

Jan. 20, 1998.

David T. Lopez, David Lopez & Associates, Houston, TX, for Plaintiff.

Christopher N. Johnsen, Office of Attorney General, Austin, TX, for Defendants.

## ORDER GRANTING SUMMARY JUDGMENT AND REQUESTING SUBMISSIONS ON ATTORNEYS' FEES

KENT, District Judge.

Plaintiff, a tenured professor and physician with the University of Texas Medical Branch at Galveston ("UTMB"), brings this action against three other physicians alleging violation of 42 U.S.C. § 1983, defamation, tortious interference with beneficial relations, and tortious interference with contract. Now before the Court is Defendants' Motion for Summary Judgment based on qualified immunity. For the reasons that follow, Defendants' Motion is **GRANTED.** Consequently, all of Plaintiff's claims are **DISMISSED WITH PREJUDICE.**

## I. FACTUAL SUMMARY

Although the parties were instructed to focus their efforts on the issue of qualified immunity, the supporting documents in this case are voluminous. Only that evidence relevant to the question of qualified immunity is considered by the Court at this juncture.

All parties in this case are physicians. Plaintiff joined the faculty of UTMB in 1979 and is now a tenured professor in the Hematology/Oncology Division, a subgroup of the Internal Medicine Department. A careful review of the supporting documents in this case presents an extremely troubling picture of Plaintiff's character, professionalism, and performance as a physician at UTMB. Indeed, Plaintiff's troubles with his colleagues and staff at UTMB began long before the November 1994 events about which he complains. Pertinent excerpts from the voluminous documents and depositions reveal extraordinary difficulties:

> My relationship with Dr. David Bessman was always strained. Eventually, the situation became so severe that I was concerned with my safety. We. lost many secretaries because of Dr. David Bessman and his many peculiarities.

> He liked to eavesdrop on others' conversations. I have seen him pressed up against the wall in his office in an obvious attempt to hide so that others would not know that he was listening to them. He always blamed others for problems, rather than own up when a problem was his fault. He rarely came into the office on time, and usually blamed his tardiness on ill health.

> Dr. Bessman had a habit of taking mail that did not belong to him. He would take it out of the mailboxes in the main office of the Department of Internal Medicine.

(Affidavit of Mary McChesney, Admin. Assistant).

> My only rotation with Dr. J. David Bessman as an intern was very unusual. Dr. Bessman only occasionally saw patients. Dr. Bessman would frequently telephone his patients from his office, instead of going into their rooms. The patients were principally managed by residents and interns.

On one weekend, I was left alone to manage the hematology/oncology ward by myself, without faculty or upper level resident supervision. At that time I was an intern. Dr. Bessman called and conducted rounds with me by telephone. That weekend I admitted patients, sent patients home and performed procedures, all without supervision.

. . .

On several occasions I conveyed other resident complaints, as well as my own observation, to Dr. Powell and Dr. Blackwell.

(Affidavit of Dr. Thomas Gregory, Chief Resident).

This brings me to your complaints that you receive duplicates, garbled, blank pages or are not receiving pages at all. You have given your complaint to, at least, nine individuals with Information Services. I have investigated [these] complaints, whether from you directly or some other source. I have on several occasions explained to you the inherent unreliability of the system.

You have complained that our support staff bear you ill will and are in some way treating you differently than other UTMB employees. Based on your complaints, I have patiently observed staff to find evidence of this. I do not agree with your assessment. I believe that our staff want and are trying their best to support every customer's needs.

You have accused staff of being uncooperative, unhelpful, and rude. I do not deny that you have "pressed buttons" and you may have received frustrated responses. However, I believe this reaction results from our staff's lack of experience with hostile, accusatory, and demeaning encounters. Many staff now dread conversations with you, during which they feel falsely accused of having a motive other than wanting to help resolve, resolvable problems. The manner in which you have addressed them has been perceived as discourteous, rude, and verbally abusive. I have given credence to these assessments only after determining they were independently arrived at. Many have requested

they no longer be required to handle your complaints. I have never received similar complaints from any additional sources about these [sic] staff.

. . .

You call me if you have any questions about the performance of your pager.

. . .

I request that you *NOT* call any other Information Services Staff regarding paging services.

(Letter Dated Feb. 10, 1997 from Cecil Denney, Director, Information Services Customer Service, to Plaintiff).

In November 1994, while Plaintiff was the "attending physician" on duty in the Hematology/Oncology Ward, a patient died during a medical procedure attempted by a physician assistant and two interns without Plaintiff's knowledge or supervision. Although Plaintiff was supposed to be on duty at the time of the patient's death, he was instead home allegedly suffering from diarrhea. Thereafter, Plaintiff was asked to write a narrative of the events leading up the incident. Defendant Dr. Don Powell, the Chair of Plaintiff's department, instructed Dr. Jerry Daniels, another Defendant in this case and Associate Chair for Clinical Affairs of the department, to investigate the patient's death and prepare a report ["Report 1"]. Dr. Daniels' report, issued on December 22, 1994, was critical of Plaintiff's performance, providing: "[Plaintiff]'s illness without on-premises coverage was a problem with supervision of the entire T9A Unit until 10:45 AM on November 17 although he was not notified of this particular incident." The report also discussed other causes of the patient's death, including faulty departmental policies.

Following the patient's death, on January 5, 1995, Plaintiff received a "warning letter" from Dr. Don Powell. Because that letter forms at least part of the basis for Plaintiff's suit, it is reproduced here:

I am writing to state my *dissatisfaction with your recent performance* with regard to two separate incidences:

1) The events of 11/17/94 [that resulted in the patient's death], including the issue with regard to the procedure that was

performed on that patient, the controversy between the housestaff and the physician's assistant on the hematology/oncology service, and the subsequent procedure performed by two of our housestaff.

2) Your recent behavior as the on-call physician over the Christmas Holidays when you signed out to Dr. Jon Mader, a person not trained as a hematologist/oncologist, to cover for you for 2 ½ days.

For the following reasons, your actions in both of these instances were not consonant with what we desire as satisfactory faculty behavior.

Regarding the patient on the hematology/oncology service and the events of 11/17/94, it appears that you were neither present nor had control of that patient's care. *The events that took place might have been avoided by your conducting your morning rounds and exerting proper supervision. Your reason given for being absent from the ward that morning was inadequate.*

With regard to the second incident, *it is unacceptable for a hematologist/oncologist to sign out for 2½ days to a faculty member who is not even trained in his subspecialty discipline.* While Dr. Mader is a superb physician, he is not a trained hematologist/oncologist.

*These events are but two of several that involve lack of adequate acceptance of responsibility on your part as a faculty member and attending physician on our Internal Medicine service.* Events such as these may impune [sic] your credibility with the housestaff and your colleagues. Repeat of events of this nature will result in action on our part to remove you from the medical staff at UTMB Hospitals, and reduce your compensation commensurately.

If you wish to discuss this further, please make an appointment with my secretary at your convenience.

Plaintiff alleges that the warning letter was given in retaliation for his earlier narratives and associated conversations regarding the patient's death. Conversely, Dr. Powell argues that the letter was not retaliation, but instead, was written to warn Plaintiff to improve his collegial behavior and practice of medicine. In support, Powell contends that:

Dr. Bessman has been a continuous source of problems since I became Chairman. He is constantly involved in difficulties with staff. There are repeated complaints about his unavailability for patients and fellow physicians.... He apparently took mail belonging to his colleagues, and even opened some of it. He intimidates medical students regarding their evaluations of him. He refuses to accept responsibility for any of his own errors, while he is quick to blame others for their errors.

(Affidavit of Dr. Don Powell, Dep't Chair of Internal Medicine). Shortly after writing the letter, Dr. Powell placed a Blue Cross audit, conducted by non-UTMB physicians, in Plaintiff's personnel file. That audit was critical of Plaintiff's work performance.

Following receipt of the warning letter, another investigation into the patient's death was conducted by the Vice President for Clinical Affairs at UTMB. On January 31, 1995, after concluding that the patient died due to substandard care, that report ["Report 2"] also noted that "[a]ppropriate faculty supervision was absent" and "communication between house officers and faculty may have avoided this episode." Following the issuance of Report 2, Dr. Powell again asked Dr. Daniels to investigate the patient's death in light of the findings of Report 2 and describe the subsequent actions required. Among other things, Dr. Daniels detailed the remedial measures being taken in regards to Plaintiff:

The Attending Faculty is clearly the leader of the care team and must be involved in *conflict resolution within the team.* Absence of the team leader has been addressed on a personal basis. Expectations of the team leader are vigorously reinforced monthly at a Ward Orientation Meeting of all inpatient faculty attendings. Problems encountered are reviewed monthly at a Ward Feedback Meeting.

Plaintiff continues to vigorously deny any fault in relation to the patient's death.

Shortly after the patient's death, Dr. Jack Alperin, another Defendant in this case and

Plaintiff's acting Division Chief at the time, conducted Plaintiff's annual evaluation. After completion, Dr. Alperin's evaluation of Plaintiff was reviewed by Dr. Powell, who lowered some of Alperin's evaluations of Plaintiff with appropriate comments. Plaintiff argues that Dr. Powell's actions were in retaliation for the incident involving the patient's death. Powell, on the other hand, contends that part of his duties as Chairman of the Department require him to bring individual division evaluations in line with the rest of the Department.

Like Dr. Daniels during the earlier incident, Plaintiff was tasked in late 1996 with writing a quality assurance report on another patient care incident involving medication error. Because of the seriousness of the results of Plaintiff's review, Dr. Powell asked Dr. Daniels to independently review the incident. Finding that Plaintiff had conducted his review without speaking to the relevant personnel involved, Dr. Daniels concluded that no weight should be given it. Based on this incident, Plaintiff claims that his free-speech rights have been violated.

Plaintiff brings this case alleging violation of 42 U.S.C. § 1983, defamation, tortious interference with beneficial relations, and tortious interference with contract.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See FED.R.CIV.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. See id. at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. See id. at 247-48, 106 S.Ct. at 2510. If the evidence is such that a reasonable factfinder could find in favor of the nonmoving party, summary judgment should not be granted. See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Dixon v. State Farm Fire & Casualty Co., 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2553; see also FED.R.CIV.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. See Matsushita, 475 U.S. at 585-87, 106 S.Ct. at 1355-56; Wise v. E.I. DuPont de Nemours & Co., 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. See Matsushita, 475 U.S. at 585-87, 106 S.Ct. at 1355-56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 586-87, 106 S.Ct. at 1355-56 (quoting FED.R.CIV.P. 56(e)).

## III. ANALYSIS

### A. Plaintiff's Due Process Claims

The Court gleans from Plaintiff's vague and ambiguous Complaint that he complains primarily of three events. The first is the warning letter which he contends falsely accuses him of wrongdoing. The second concerns the scores recorded on his annual eval-

uation which were lowered by Defendant Powell. Finally, he complains that Defendants disregarded his quality assurance report. From these three events Plaintiff claims that his Fourteenth Amendment Due Process rights (procedural and substantive) were violated. He also asserts that Defendants violated his First Amendment right of free expression and right to petition, and alleges interference with contract, interference with beneficial relations, and defamation.

■ At the outset, the Court notes that while Plaintiff does not make any specific argument or present any authority to support his claims alleging violation of his liberty or property interests, the Fifth Circuit has recognized a liberty interest protected by the Due Process Clause that encompasses a person's right to work and to earn a living. *See Wells v. Doland*, 711 F.2d 670, 675 (5th Cir. 1983).[1] Plaintiff in this case, however, was not discharged, transferred, reprimanded, or demoted; instead, he was warned to improve his unprofessional behavior. Using Plaintiff's words, Defendants "suggested" that Plaintiff would lose his hospital privileges. Plaintiff alleges that he has an interest in being free from wrongful accusations because they affect him professionally. By Plaintiff's own admission, however, he continues to work at UTMB with the same privileges. The Court finds, therefore, that the question whether Plaintiff received proper process, which the Court finds as a matter of law he did,[2] is irrelevant because no property or liberty interest was deprived. There simply is no liberty interest in being free from stigma. *See Silva v. Worden*, 130 F.3d 26, 32

(1st Cir.1997) ("Despite the 'drastic effect of the stigma ... reputation alone, apart from some more tangible interests ..., is [n]either 'liberty' [n]or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause.'" (quoting *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976))). Plaintiff's claims alleging deprivation of a property interest without procedural due process, deprivation of a liberty interest without procedural due process, and violation of substantive due process, therefore, lack merit and are *sua sponte* **DISMISSED WITH PREJUDICE.** These claims are more properly characterized as free speech claims, which are discussed below.

### B. Plaintiff's State–Law Claims Against Defendants in Their Official Capacities

■ A Court should dismiss for failure to state a claim only when it appears without a doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994). Plaintiff brings this case against Defendants in their official and individual capacities. When a plaintiff brings suit against a governmental official in his official capacity, that suit is essentially a suit against the government. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her

---

1. The Supreme Court has also stated that when a public employer discharges an employee and makes charges against him that might damage his standing in the community, the employee's liberty interest may be involved. In that situation, the employee must receive an adequate hearing to clear his name. *See Board of Regents v. Roth*, 408 U.S. 564, 573–74, 92 S.Ct. 2701, 2707–08, 33 L.Ed.2d 548 (1972). To establish such a deprivation under the Fourteenth Amendment, Plaintiff must show three things: (1) that he has, in fact, been stigmatized as a result of the discharge process; (2) that the charges were made public; and (3) that he was denied a meaningful hearing to clear his name. *See Wells*, 711 F.2d at 676; *see also In re Selcraig*, 705 F.2d 789, 795–96 (5th Cir.1983); *Dennis v. S & S Consoli-*

dated Rural High School Dist., 577 F.2d 338, 341 (5th Cir.1978); *Ortwein v. Mackey*, 511 F.2d 696, 699 (5th Cir.1975). Based on this test, the Court has no difficulty in deciding that Plaintiff has not been deprived of a liberty interest. Again, Plaintiff was not discharged. Moreover, it is clear from the warning letter that Defendant Powell gave Plaintiff the opportunity to "clear his name."

2. Plaintiff wrote narratives of the circumstances leading up to the patient's death. Moreover, Plaintiff spoke with Dr. Powell on several occasions. The warning letter clearly stated that Plaintiff could come talk with Dr. Powell.

official capacity is not a suit against the official but rather is a suit against the official's office."); *Pickell v. Brooks*, 846 S.W.2d 421, 424–25 (Tex.App.—Austin 1992, writ denied) (citing *Herring v. Houston Nat'l Exch. Bank*, 113 Tex. 264, 253 S.W. 813, 814–15 (1923)). Thus, it follows that Plaintiff's causes of action against Defendants in their official capacities are in fact a causes of action against UTMB, because that entity is an arm of the State of Texas. *See* Tex.Educ.Code Ann. §§ 65.02(a)(8), 74.001 (West 1997).

The doctrine of governmental immunity bars Plaintiff's state-law claims against UTMB. Governmental immunity consists of two principals of law. First, the state as a sovereign cannot be sued without its permission. *See, e.g., Hosner v. De Young*, 1 Tex. 764, 769 (1847); *Dillard v. Austin Indep. Sch. Dist.*, 806 S.W.2d 589, 592 (Tex.App.—Austin 1991, writ denied). This principal bars the suit unless the state has expressly consented to being sued. *See, e.g., Missouri Pac. R.R. v. Brownsville Navigation Dist.*, 453 S.W.2d 812, 814 (Tex.1970). Second, the state has immunity from liability even though the state has consented to being sued. *See, e.g., State v. Isbell*, 127 Tex. 399, 94 S.W.2d 423, 424 (Tex.Com.App.1936) (noting a distinction between the creation of liability on the part of the state and the mere waiver of immunity). The waiver of governmental immunity is a matter properly addressed to the state legislature. *See Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex. 1976).

In this case, Plaintiff has not shown that the state has consented to his suit against the individual members in their official capacities. Thus, to the extent that Plaintiff brings state-law claims of defamation, interference with beneficial relations, and tortious interference with contract against Defendants in their official capacities, such claims are **DISMISSED WITH PREJUDICE** pursuant to Fed.R.Civ.P. 12(b)(6). *See Baldwin v. University of Texas Medical Branch at Galveston*, 945 F.Supp. 1022, 1030–31 (S.D.Tex.1996) (Kent, J.), *aff'd*, 122 F.3d 1066 (5th Cir.1997).

## C. Qualified Immunity Bars Plaintiff's Claims Against the Defendants in Their Individual Capacities

The question of qualified immunity is a threshold issue that determines Defendants' immunity from suit, that is, their ability to avoid a trial altogether, rather than merely their immunity from damages. *See Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir.1993). Qualified immunity shields government officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). When sued in his individual capacity, a governmental employee is entitled to a presumption of qualified immunity from suit. *See Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir.1990). To overcome this presumption, a plaintiff has the burden to prove that no reasonable, similarly situated, official could have considered the conduct of the government officials to be lawful, under the circumstances known to him at the time. *See Anderson*, 483 U.S. at 640–41, 107 S.Ct. at 3039–40; *Burns–Toole v. Byrne*, 11 F.3d 1270, 1274 (5th Cir.1994). The reasonableness inquiry of the official's conduct is measured with reference to the law as it existed at the time of the conduct in question. *See King v. Chide*, 974 F.2d 653, 657 (5th Cir. 1992). "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Pfannstiel*, 918 F.2d at 1183.

The Fifth Circuit has recognized that "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir.1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991)). The Fifth Circuit has also developed a two-step process for the examination of a claim of qualified immunity. The first inquiry is whether Plaintiff has alleged a violation of a clearly established constitutional right. *See Siegert v. Gilley*, 500 U.S. 226, 231–32, 111

S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The next step is to judge the reasonableness of the alleged behavior. *See King,* 974 F.2d at 657. When the Court has a clear picture of what occurred during an incident giving rise to the qualified immunity defense, the "reasonableness" question becomes one of law. *See Lampkin v. City of Nacogdoches,* 7 F.3d 430, 435 (5th Cir.1993) (acknowledging that qualified immunity should normally be determined by the Court).

 Plaintiff argues that the lowering of his annual evaluation, the warning letter, and the Blue Cross audit are retaliatory actions resulting from his speaking out about the welfare of patients at UTMB. Plaintiff also contends that by changing his conclusions in the quality assurance report, Defendants again conspired to prevent him from speaking out on matters of public concern.[3] In order for a public employee to demonstrate a deprivation of free speech, the employee must show that:

1. the speech addresses a matter of public concern;
2. the employee's interest in communicating upon matters of public concern outweighs the defendant's interest in promoting the efficiency of the public service they [sic] perform; and
3. the employee's discipline was motivated by the uttered speech.

*Thompson v. City of Starkville,* 901 F.2d 456, 460 (5th Cir.1990).

 The Supreme Court has clearly stated that whether speech addresses a matter of public concern depends on "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). In making this decision, the Court must decide whether the speech in question was made primarily in the plaintiff's role as a citizen or primarily in his role as an employee; any speech that is made in the role of an employee cannot be a matter of public concern. *See Ayoub v. Texas A & M Univ.,* 927 F.2d 834, 837 (5th Cir.1991). However, the fact that a

statement was made through private rather than public channels does not preclude a finding that it touched on a matter of public concern. *Brown,* 804 F.2d at 337 ("The fact the speech was delivered privately ... rather than to Bob Woodward and Carl Bernstein, does not necessarily render the speech any less protected.").

Assuming for the moment that Plaintiff has properly stated a claim for violation of his First Amendment rights, the Court must now consider whether the First Amendment right which Defendants allegedly violated was "clearly established." *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. It is clearly settled law that a government employer cannot retaliate against an employee for the exercise of protected First Amendment rights. *Reeves v. Claiborne County Bd. of Educ.,* 828 F.2d 1096, 1103 (5th Cir. 1987) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Mt. Healthy,* 429 U.S. at 274, 97 S.Ct. at 568. It is also clearly established law that it is a constitutional violation to threaten discharge for the exercise of First Amendment rights. *See Fyfe v. Curlee,* 902 F.2d 401, 404 (5th Cir.1990) (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968).) Although the determination of which First Amendment rights are protected involves a balancing test, prior adjudication of relatively similar facts can put Defendants on notice of the legality of their actions and constitute clearly established law for purposes of qualified immunity inquiries. *See Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989); *Berdin v. Duggan,* 701 F.2d 909 (11th Cir.1983).

 The Court disagrees with Plaintiff's characterization of his speech. In this case, the evidence reveals that Plaintiff's alleged "speech" is not the type clearly established as protected by the United States Constitution. Instead, Plaintiff's speech consists almost entirely of his internal efforts within UTMB to avoid blame for a patient's death following two reports that partly implicate him. When a public employee speaks

---

3. The Court notes that qualified immunity also acts to bar Plaintiff's Due Process claims be-

cause, as alleged, Plaintiff's Due Process claims are not clearly established.

not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, the courts are not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency in reaction to the employee's behavior. *See Connick,* 461 U.S. at 147, 103 S.Ct. at 1690, 75 L.Ed.2d 708. Plaintiff's excuses are of no concern to the public or, for that matter, this Court, and they are certainly not protected by the First Amendment.

The evidence in this case reveals that Plaintiff wrote a scathing report impugning the professionalism of another colleague without actually talking to the persons involved in the incident. Such a report reflects poorly on the professionalism of Plaintiff himself. The Court observes that Plaintiff's conclusions found in his "overruled" quality assurance report could conceivably rise to the level of protected speech. However, these statements suffer from two fatal flaws. First, the evidence overwhelmingly reveals that Plaintiff's conclusions were based on insufficient data. Plaintiff fails to demonstrate clearly established law stating that the public is concerned with false allegations uttered against one's colleague or that such speech is protected. Second, Plaintiff fails to establish that he made his unsupported conclusions public.

Plaintiff is, by most accounts, a rude, arrogant, and impertinent individual. Individuals with no interest whatsoever in this case state that he verbally abuses people with which he deals, has little regard for the feelings of others, and lacks basic interpersonal skills. The residents and students under his charge have consistently ranked him lowest of all attending physicians. Further, UTMB has received numerous complaints regarding Plaintiff's consistent unavailability. Defendants have offered evidence that Plaintiff regularly missed rounds, was late for his rounds, or conducted rounds by telephone. Two reports conducted by two different individuals with no relation or contact with each other revealed that he was at least partly at fault for the death of a patient because he did not properly supervise those under his tutelage.

Although Plaintiff argues that the warning letter and Blue Cross audit were retaliatory acts for speaking out about public welfare concerns, the overwhelming evidence in this case reveals that Dr. Powell was well aware of Plaintiff's troubled history at UTMB, Plaintiff's poor relations with others, and the two reports when he gave Plaintiff the letter and the Blue Cross audit. Moreover, Dr. Powell, as Department Chair, was well within his authority when lowering Plaintiff's annual evaluation scores. The Court finds that not only were Defendants' actions appropriate under the circumstances, but they were also quite mild considering the astonishing nature and history of Plaintiff's appalling conduct. Thus, even if the clearly established law protects Plaintiff's speech as he alleges, a reasonable person could not possibly believe Defendants were violating the law by taking action.

### D. *Plaintiff's Constitutional Claims Would Fail on Their Merits*

■ Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983. "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates." *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir.1989). Assuming that Plaintiff could overcome the qualified immunity obstacle, before he can successfully assert § 1983 as a valid cause of action against these Defendants, Plaintiff must first identify a specific constitutionally protected right that has been infringed. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). Plaintiff asserts underlying violations of the First and Fourteenth Amendments to the United States Constitution as the bases for his § 1983 claim.

As already established, however, Plaintiff's Due Process Claims are totally devoid of merit. Similarly, because the speech in this case does not rise to the level of that protected by the Constitution, and because the

evidence overwhelmingly demonstrates that Defendant's actions were not substantially motivated by that speech, Plaintiff's § 1983 claims are not viable. Therefore, even if Plaintiff could overcome the immunity obstacles, Plaintiff's constitutional claims fail on their merits.

## IV. CONCLUSION

After carefully reviewing the summary judgment evidence, the Court shudders when it contemplates medical treatment at the hands of Plaintiff or those he allegedly supervises. The medical community literally holds the life of the public in its hands. It should be a position of integrity, compassion, and responsibility. It should never be a safe haven for craven incompetents, who use the lofty title of "physician" to bully subordinates and abuse patients. It is clear that this dispute is an internal one between physicians at UTMB which does not require Court involvement. This Court resolves well over 700 cases each year. Because of the Court's massive caseload, judicial resources are reserved for those aggrieved parties with causes of action having a basis in both law and fact. Plaintiff's case has neither. Plaintiff's attempts to "make a federal case" out of his well-deserved warning for utterly unprofessional behavior, which could have very well cost a life, are grossly inappropriate. Such frivolity wastes judicial resources, prevents utilization of the Court by those who truly need judicial action, and also feeds the public's misperception regarding abusive and frivolous lawsuits, and the system as a whole.

In any action or proceeding to enforce a provision of § 1983, the Court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs. *See* 42 U.S.C. § 1988. Defendants are **ORDERED** to submit appropriate documentation regarding attorneys fees in this case within thirty (30) days. Any response thereto will be due in twenty (20) days from the date of the filing of the request. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).

For the foregoing reasons, Defendants' Motion for Summary Judgment based on qualified immunity is hereby **GRANTED.**

All of Plaintiff's claims are **DISMISSED WITH PREJUDICE.** The parties are **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider or the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the Fifth Circuit Court of Appeals, as may be appropriate in due course. In due course, the Court will address the issue of attorneys' fees, and will at that time enter a final judgment.

**IT IS SO ORDERED.**